**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

**ALBERT LYNN COLE, ADC #090762**                                   **PLAINTIFF**

**v.**                                           **No. 5:11-cv-00232 KGB**

**ARKANSAS DEPARTMENT OF CORRECTION,
RAY HOBBS, in his official capacity as Director
of the Arkansas Department of Correction, and
OFFICER DEMERY, in their individual and
official capacities as correctional officers for the
Arkansas Department of Correction**                           **DEFENDANTS**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Albert Lynn Cole brings this action against Arkansas Department of Correction

("ADC") officer Michael Demery in his individual and official capacities.[1]  Pursuant to Federal

Rule of Civil Procedure 52(a), the Court makes the following specific findings and conclusions.

### A.    Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1343.  Mr. Cole seeks relief pursuant

to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States

Constitution.

### B.    Findings of Fact

The parties do not dispute that, on or about September 9, 2008, Mr. Cole was

incarcerated at the ADC Varner Unit.  He was a trustee at the time of the events about which he

complains; he was assigned to work in the horse barn.  (Pl.'s Ex. 26)  To have this work

assignment, Mr. Cole was a Class I-A or Class I-B inmate, according to testimony from Officer

Demery.  Officer Demery and Mr. Cole did not know one another or have regular contact with

one another prior to September 9, 2008.  Mr. Cole testified that he filed no grievances as an

---

[1] By prior order, this Court granted defendants' motion for summary judgment on Mr. Cole's
claims against the Arkansas Department of Correction and separate defendant Ray Hobbs in his
official capacity as Director of the Arkansas Department of Correction.  (Dkt. No. 25)

ADC inmate other than those relating to this incident.  He also testified that this was the first lawsuit he filed.

On September 9, 2008, Mr. Cole was riding a horse as part of his job responsibilities with the ADC when he was thrown from the horse and injured his right shoulder.  He reported to the infirmary at approximately 9:50 a.m.  He was treated at the prison infirmary, where his arm was x-rayed and placed in a sling.  Mr. Cole was transported by Officer Demery and Officer Donna Venable to Jefferson Regional Medical Center ("JRMC") for further evaluation.  Officer Demery denied knowing that, at the time he transported Mr. Cole, Mr. Cole was a Class I-A or Class I-B inmate.

## 1.    Transport to and from JRMC

Mr. Cole testified that Major Curtis Gibson, Officer Demery's superior, told Officer Demery to leave his right arm alone.  At that point, Mr. Cole's arm was bound and under his shirt in the sling applied by infirmary staff.  Officer Demery testified that Major Gibson said nothing about the use of restraints.  Officer Venable testified that she did not hear Major Gibson say anything about restraints.  Major Gibson testified that, although he did not recall the specific incident or Mr. Cole, he regularly worked as the Varner Unit's Duty Warden and assigned officers to make medical transport runs.  In that role, he would have informed officers such as Officer Demery to restrain the inmate, be alert, be safe, and make contact upon arrival at the location and upon return back to the unit.  Major Gibson explained that such advice was consistent with ADC policy which counsels that inmates be restrained when they leave the unit.  According to Major Gibson, the ADC has a duty to protect the public when transporting inmates away from the unit and that, even on medical transport runs, inmates can pose a threat, launch an attack, or be a flight risk.  Based upon the testimony presented, the Court credits the testimony of

Officer Demery and Major Gibson on this point.  Both of them were forthright in their manner while testifying.  The Court does not find that Major Gibson specifically instructed Officer Demery not to handcuff Mr. Cole's right wrist during transport.

According to Officer Demery, Mr. Cole was transported to JRMC in handcuffs and leg irons.  Officer Demery testified that, when he first saw Mr. Cole in the infirmary, Mr. Cole's right arm was secured to his body and bound in a sling.  Officer Demery testified that he assisted Mr. Cole from the wheel chair in which he was sitting into the transport van; positioned Mr. Cole in the van, leaning him to his left so as to make him as comfortable as possible; put leg irons on him; cuffed his left arm first, ran cuffs under his injured arm, and secured his right wrist and arm without moving them; transported him cuffed to JRMC; removed the handcuffs to assist Mr. Cole out of the van; replaced the handcuffs as soon as Mr. Cole's feet hit the ground outside JRMC; and then did not remove the handcuffs again until Mr. Cole was assisted back into the van, after meeting and speaking with the JRMC doctor.  Mr. Cole contends that only his left wrist was handcuffed to his body on the trip to JRMC, fastened with two leg irons in make-shift fashion.  He claims his right arm was left alone by Officer Demery on the trip to JRMC.

Mr. Cole was evaluated at JRMC by Dr. Charles Clark.  Mr. Cole was admitted to JRMC at 15:49 p.m. on September 9, 2009.  (Def.'s Ex. 3b)  Dr. Clark determined that Mr. Cole sustained a fracture at the juncture of the middle and distal thirds of the clavicle, with minimal inferior displacement of the distal fragment relative to the proximal fragment.  (Def.'s Ex. 3d)  Dr. Clark prescribed Vicodin and Flexoril and told Mr. Cole to follow up with Dr. John Lytle in three weeks.  The Discharge Summary directs Mr. Cole to remain in a sling, to ice his right arm, and to rest.  The General Care Instructions do not indicate any other special treatment necessary for the fracture.  (Def.'s Ex. 3c)  Connie Hubbard, an advanced practice nurse employed by

Corizon, testified that the ADC substituted comparable medications for those prescribed to Mr. Cole sometime after Mr. Cole returned to the ADC September 9, 2009.  (Def.'s Ex. 3f and 3g) Corizon contracts with the ADC to provide medical care to inmates, based on Nurse Hubbard's testimony.

Mr. Cole testified that Dr. Clark told him, in the presence of Officer Demery, not to move his right arm.  Officer Demery and Officer Venable testified that Dr. Clark said nothing about the use of handcuffs.  In fact, Officer Demery testified that neither Dr. Clark nor any member of the medical staff requested at any point that the handcuffs be removed from Mr. Cole.  Mr. Cole concedes that Dr. Clark did not take his arm out of the sling to examine it; he contends Dr. Clark said his arm was immobilized as it should be.  Based on all of the evidence presented on this point, the Court finds that Dr. Clark did not instruct directly or indirectly Officer Demery or Officer Venable on the use of handcuffs or restraints.

It is undisputed that Officer Demery handcuffed Mr. Cole's right wrist before the return trip to the Varner Unit.  Officer Demery testified that his actions on the return trip were consistent with his actions during the initial transport.  He testified that, after Mr. Cole spoke with Dr. Clark about his injury, Officer Demery escorted Mr. Cole back to the transport van; removed the handcuffs to assist Mr. Cole into the van; replaced the handcuffs on Mr. Cole after positioning Mr. Cole in the van, leaning him to his left so as to make him as comfortable as possible; and transported him back to the Varner Unit while he was handcuffed.  After Mr. Cole was back at the Varner Unit, his handcuffs were removed, and he exited the transport van.  Officer Venable testified that, in her estimation, Officer Demery did more than he had to do by assisting Mr. Cole into and out of the van, leaning him to his left so as to make him comfortable, and driving under the speed limit in the lane with fewer potholes so as to avoid jostling Mr.

Cole's arm.  She denied that Officer Demery lifted Mr. Cole's shirt or removed his arm from the sling.  Officer Venable testified that, repeatedly on the trip, she and Officer Demery asked Mr. Cole if he was okay, to which he always responded yes.  She said that Mr. Cole did not voice any complaints about his positioning, handcuffs, or treatment.

Mr. Cole testified differently.  He claims Officer Demery told him to lift his shirt and that he asked Officer Demery what he was doing.  Mr. Cole claims he said that "that wasn't right" and told Officer Demery not to handcuff his right wrist, but Officer Demery insisted.  Mr. Cole claims Officer Demery told him to get in, shut up, sit down, and that it would be over before he knew it.  Mr. Cole also claims he made a plea to Officer Venable to intervene but that she instead gestured as to her height in relation to Officer Demery's height, purportedly indicating there was nothing she could do.  All parties admit Officer Demery was higher in rank than Officer Venable at the time.  Officer Demery also is larger in physical stature than Officer Venable.  Mr. Cole claims Officer Venable did commit to Mr. Cole she would tell the truth about the incident.  Mr. Cole asserts that Officer Demery then placed his right wrist in handcuffs by lifting up his shirt, grabbing his hand, and pulling his right arm out of the sling far enough to place handcuffs around his right wrist.  Mr. Cole asserts that, when this happened, he heard and felt his arm pop.  He contends it was very painful.

Mr. Cole returned to the Varner Unit sometime around 6:29 p.m. September 9, 2008.  There is no dispute that Mr. Cole, when handcuffed on the return trip to the Varner Unit, did not cry out.  He did not go immediately to the infirmary upon his return.  He did not complete a sick call slip, and no medical record indicates that he complained that day he had been handcuffed or felt his right clavicle had been disturbed by Officer Demery.  He also did not immediately complete or file an ADC grievance.  Although Mr. Cole seems to claim his failure to file a

grievance immediately was the result of his condition and medication, the only medication the medical records reflect Mr. Cole received was medication at the infirmary shortly after the accident.  (Pl.'s Ex. 12)  There is no testimony that Mr. Cole received additional medication at JRMC.  He did not return from JRMC with medication on his person, only prescriptions that were filled sometime later.  These facts, taken with all of the testimony and evidence presented on this point, persuade the Court to reject Mr. Cole's recitation of events he claims occurred on the trips between the Varner Unit and JRMC.  Officer Demery and Officer Venable appeared to be sincere when they testified about these events, and the Court credits their testimony.

### 2.      Grievances and Follow-Up Medical Care in ADC

There is no dispute that Mr. Cole first submitted a grievance on September 17, 2008, complaining about the events that are the subject of this suit.  (Pl.'s Ex. 1)  Mr. Cole's September 17, 2008, grievance refers to an x-ray taken the day after the incident, which would be September 10, 2008, but there was no other evidence submitted indicating that Mr. Cole had an x-ray taken on September 10, 2008.

Mr. Cole saw Nurse Hubbard on September 24, 2008, who referred Mr. Cole for a follow-up x-ray "to assess alignment as he [complains of] having had cuffs on return from JRMC."  (Def.'s Ex. 3k)  She noted a "prominence of the rt clavical laterally" and indicated that the clavicle "mov[es] when he lays down at night."  The next day, Nurse Hubbard noted that the x-ray showed "a healing fracture of the mid 1/3 of the right clavicle in anatomic position." (Def.'s Ex. 3l)

On September 25, 2008, Mr. Cole saw Dr. Robert Scott, a doctor who contracts with Corizon.  Dr. Scott reviewed an x-ray taken on September 24, 2008, and noted a mal-alignment at the site of Mr. Cole's fracture.  Dr. Scott also noted that Mr. Cole failed to wear the clavicle

straps he had been given.  (Def.'s Ex. 3m)  Testimony from Nurse Hubbard indicates that these straps go around the waist and aid in keeping the clavicle immobilized during the healing process.  By not wearing the straps, the broken clavicle is more mobile.

On September 25, 2008, Mr. Cole filed a grievance related to his broken clavicle.  He complained that the doctor told him his shoulder was just as bad as the day it happened but that he would not receive any medical treatment to heal his condition because it would cost the ADC too much money.  He asked to be seen by a specialist who could correct his problem.  (Def.'s Ex. 2, 10a-c)  Mr. Cole testified Dr. Clark from JRMC told him surgery was needed to pin and plate the bone to keep it in proper alignment and to facilitate healing.  Mr. Cole further testified that Dr. Clark advised him he would not perform surgery because he knew that the state would not pay for the procedure.  The Court notes that there is no written record from Dr. Clark in evidence indicating Dr. Clark gave this advice to Mr. Cole, and Dr. Clark did not testify.

The September 25, 2008, grievance was deemed a medical grievance and referred by the ADC to Corizon for a response.  A member of the medical staff wrote in response to Mr. Cole's grievance:  "Noncompliance from you resulted in the improper alignment of your clavicle. Failure to wear the support caused the problem.  We are now investigating other medical avenues regarding your shoulder."  (Pl.'s Ex. 2)

Mr. Cole saw Nurse Hubbard again on October 8, 2008, at which time Nurse Hubbard noted a "visible prominence of the clavical [sic]."  (Def.'s Ex. 3o)

Mr. Cole followed up with Dr. Lytle, a specialist who contracts with Corizon, on October 15, 2008, and again on November 5, 2008.  During both visits, Dr. Lytle indicated that the clavicle was healing properly.  On October 15, 2008, Dr. Lytle noted the x-ray revealed Mr. Cole's fracture was in good position and would take a minimum of six to 12 weeks to heal.  He

demonstrated pendulum exercises and instructed Mr. Cole to begin using them and to continue his sling.  (Def.'s Ex. 3p)  On November 5, 2008, Dr. Lytle noted the good position of Mr. Cole's fracture, discontinued the sling, and instructed Mr. Cole to begin active range of motion exercises for rehabilitation, not to use his right arm, and to avoid weight lifting.  (Def.'s Ex. 3s)  Dr. Lytle recorded the following based on the November 5, 2008, exam:  "There is no gross mal alignment or tenting of the skin."  (Def.'s Ex. 3s)

### 3. Alleged Retaliation

Mr. Cole also filed a grievance on September 21, 2008.  (Def.'s Ex. 9a-9g)  He alleged that he was approached by Officer Demery in the dining hall and exchanged threatening words with Officer Demery.  Officer Demery denied the allegation and claimed that he passed Mr. Cole in the dining hall and asked how Mr. Cole's shoulder was.  Officer Demery claimed those were the only words that passed between Mr. Cole and him.  (Def.'s Ex. 9e)  The Court credits Officer Demery's testimony on this point based on witness demeanor at trial and the lack of any corroborating evidence presented by Mr. Cole.

### 4. Post-ADC Medical Care

On February 25, 2009, after his release from prison, Mr. Cole was evaluated by Dr. Christopher Morgan of Baptist Health Medical Clinic in Stuttgart, Arkansas.  Dr. Morgan noted an "obvious deformed clavicle."  (Def.'s Ex. 4, at 2)  Dr. Morgan referred Mr. Cole for an orthopedic evaluation of his shoulder.

Mr. Cole was then examined by Dr. John Wilson at the University of Arkansas for Medical Sciences on March 13, 2009, with a follow-up on March 20, 2009.  Dr. Wilson noted a "step-off over the distal junction, middle distal third of [the] clavicle on the right with some tenderness" and a "fracture of [the] right clavicle in bayonet position with some callus

formation." (Def.'s Ex. 4, at 26)  The plan, as noted by Dr. Wilson on the March 13, 2009, visit,

was for Mr. Cole to have an MRI of his right shoulder and to return following that study for

"definitive recommendations." (Def.'s Ex. 4, at 26)

At the follow-up visit on March 20, 2009, the Outpatient Note from Dr. Wilson's record

states:

> This gentleman was recently seen because of concerns of rotator cuff injury following a
> horse accident in which he sustained also a clavicular fracture on the right.  MRI revealed
> callus formation of the clavicular fracture.  There is no evidence of tear of the rotator
> cuff.
>
> This gentleman has been immobilized for some time with his clavicular fracture, so I
> assumed that his weakness and discomfort is primarily from disuse.
>
> Mr. Cole was injected in the right shoulder with steroid and Xylocaine.  He was
> instructed in strengthening exercises.  He is to return if he has continued problem.

(Def.'s Ex. 4, at 7)  There is some evidence in the record that Dr. Wilson referred Mr. Cole for

hand therapy.  (Def.'s Ex. 4, at 36)  There are medical bills in the record that correspond to the

evaluation and treatment Mr. Cole received at Baptist Health Medical Clinic in Stuttgart,

Arkansas, and at the University of Arkansas for Medical Sciences.  (Pl.'s Ex. 21-25)

There was also testimony by Mr. Cole that, at some point, he stopped seeing his parole

officer and purposely went back into the ADC so that the ADC could assist in his medical care.

He claims he exhausted his resources before taking this step.  From evidence presented, this step

did not yield the result Mr. Cole intended.  Mr. Cole did not dispute he also suffers from health

problems associated with his sciatic nerve and four ruptured disks in his neck.

### 5.    Policy Regarding Restraints

In response to Mr. Cole's grievance regarding the use of handcuffs on him during

transport to and from JRMC, the ADC responded by explaining:

> Please understand Inmate Cole, security equipment is used to prevent escape, assault or the commission of some other offense by violent or disruptive offenders; and to protect employees, offenders and other individuals. Restraint devices shall not be removed until the offender is placed in a secure area or upon the express approve [sic] of the warden/center supervisor, chief of security, or designee. Restraints will not be used longer than is necessary.
>
> Unit policy also states that all inmates being transported must be handcuffed and security belted. Leg irons may also be used to provide additional security. The transporting officer must use good judgment in the use of restraints. In case of doubt, the correctional officer should restrain the inmate.

(Def.'s Ex. 8d) The Court finds that language of the ADC policies and directives on the use of restraints and transporting inmates supports this interpretation.

The Warden of the Varner Unit issued a Policy and Procedure regarding transporting inmates outside the unit. That policy requires inmates being transported outside the unit to be handcuffed and security belted, with leg irons available to provide additional security. (Def.'s Ex. 7a) The policy requires the transporting officer to "use good judgment" in the use of restraints but specifically states that "[i]n case of doubt, the correctional officer should restrain the inmate." (Def.'s Ex. 7a)

An ADC Administrative Directive regarding the inmate transportation section addresses in part the use of restraints. (Def.'s Ex. 7) It provides that "[i]nmates being transported from one unit/center to another or being taken from and returned to a unit/center must be handcuffed. A security belt and/or leg irons may also be used to provide additional security. . . ." Exceptions to the policy "may include" inmates in Class I-A and I-B status. (Def.'s Ex. 7)

The ADC's Administrative Regulation regarding the transporting and escorting of offenders tracks this language but is not identical. (Def.'s Ex. 6) The Administrative Regulation states in pertinent part:

> All offenders being transported from one unit/center to another or being taken from and returned to a unit/center must be handcuffed. A security belt and/or leg irons may also be

used to provide additional security.  They may also be used while escorting offenders if used for the good order and security of the department.

Exceptions to the policy "may include" offenders in the least restrictive class meaning Class I-A and I-B.  (Def.'s Ex. 6)

The ADC also has an Administrative Regulation specific to the use of restraints.  (Def.'s Ex. 5)  It states that the departmental policy is "to use restraints only when circumstances require the protection of offenders, staff, or other individuals from potential harm or to deter the possibility of escape."  Like the other policies, it states that "[u]pon the determination of the warden/center supervisor, chief administrative officer, or designee, handcuffs and/or leg irons may be utilized when escorting/moving offenders within or on a unit/center" and that leg irons may also be used to provide additional security.  (Def.'s Ex. 5)

Officer Demery testified he was trained on the use of restraints, understood that the policies afforded him some discretion, but handcuffed Mr. Cole based on his understanding and application of the policies out of concerns for public, inmate, and officer safety.  The Court finds this testimony credible.

### C.    Conclusions of Law

In support of his 42 U.S.C. § 1983 claim, Mr. Cole alleges an Eighth Amendment violation.  "The Eighth Amendment prohibits the infliction of cruel and unusual punishment. '[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Schaub v. Vonwald*, 638 F.3d 905, 914 (8th Cir. 2011) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).

Mr. Cole brings this claim against Officer Demery in his official and individual capacities.  Suits against officials in their official capacities require a showing that an official policy or custom caused a constitutional violation; there must be an affirmative link or causal

connection between the policy and the particular constitutional violation alleged.  In contrast, suits against officials in their individual capacities seek to impose liability for actions taken under color of state law.  In such cases, the plaintiff is required to show that the official caused a deprivation of a federal right.  *See Clay v. Conlee*, 815 F.2d 1164, 1169-70 (8th Cir. 1987); *Rollins v. Farmer*, 731 F.2d 533, 535 (8th Cir. 1984).  Qualified immunity "is available only to individuals sued in their individual capacities and not individuals sued in their official capacities."  *Rollins*, 731 F.2d at 536.

1.      **Claims Relating to Medical Care**

a.      **Use of Restraints**

To prevail on an Eighth Amendment claim for deprivation of medical care, Mr. Cole must satisfy two requirements.  First, he must show that the alleged deprivation, viewed objectively, is sufficiently serious.  Second, he must show that Officer Demery was deliberately indifferent to a serious medical need or substantial risk to his health or safety.  *Nelson v. Correctional Med. Servs.*, 583 F.3d 522, 528-29 (8th Cir. 2009) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  The second requirement is a subjective one; "the official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.

Mr. Cole has established a serious medical need; he was treated by Dr. Clark for a fractured clavicle.  *See Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997) ("A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.").

To prevail, Mr. Cole then must show that Officer Demery was deliberately indifferent to his serious medical need or a substantial risk to his health or safety.  *Nelson*, 583 F.3d at 528-29.

This Court concludes that Mr. Cole has not carried his burden to establish that Officer Demery was deliberately indifferent to Mr. Cole's medical need.  What constitutes deliberate indifference on the part of prison officials has been examined by many courts.  "It is at least clear that mere negligence or inadvertence is insufficient to satisfy this standard."  *Choate v. Lockhart*, 7 F.3d 1370, 1374 (8th Cir. 1993).  "Indeed, deliberate indifference requires the 'unnecessary and wanton infliction of pain.'"  *Id.* at 1374 (quoting *Givens v. Jones*, 900 F.2d 1229, 1232 (8th Cir. 1990)).  "Thus, whatever its exact contours, deliberate indifference requires a highly culpable state of mind approaching actual intent."  *Id.* at 1374.

Mr. Cole need not show that Officer Demery actually believed that handcuffing him would harm him, for "it is enough that the official acted or failed to act despite [his] knowledge of a substantial risk of serious harm."  *Nelson*, 583 F.3d at 529 (quoting *Farmer*, 511 U.S. at 842).  Whether Officer Demery knew that handcuffing presented a substantial risk to Mr. Cole "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Id.*  Even if the risk is obvious, however, this Court may conclude that Officer Demery was unaware of the risk to Mr. Cole's health or safety.  *Id.*  Considerations for the Court on this issue are whether Officer Demery "lacked medical training, that the hospital staff did not explicitly forbid the use of [handcuffs], or that [Mr. Cole] did not expressly state how painful and uncomfortable they were. . . ."  *Id.*

Officer Demery testified that Dr. Clark did not remove Mr. Cole's arm from the sling or request at any point that the handcuffs be removed from Mr. Cole during the exam at JRMC on September 9, 2008.  No contrary evidence was presented on this point.  Further, based on all of

the evidence presented, the Court finds that Dr. Clark did not instruct Officer Demery or Officer Venable on the use of handcuffs or restraints.

There is no dispute that Mr. Cole, when handcuffed on the return trip to the Varner Unit, did not cry out. He did not go immediately to the infirmary upon his return. He did not file a sick call slip to report that the handcuffing disturbed his right clavicle. He also did not immediately complete or file an ADC grievance. The Court does not credit Mr. Cole's stated excuse for failing to file an ADC grievance immediately regarding these alleged events. The Court does not credit Mr. Cole's recitation of events he claims occurred during the medical transport. For these reasons, the Court concludes that Mr. Cole has not carried his burden to establish that Officer Demery was deliberately indifferent to Mr. Cole's medical needs. There is no dispute Officer Demery applied handcuffs, but the Court is not persuaded that by doing so Officer Demery was deliberately indifferent to Mr. Cole's medical needs.

Even if Mr. Cole could prove that Officer Demery was deliberately indifferent to Mr. Cole's medical needs, which he has not, Mr. Cole to prevail still would have to prove that Officer Demery caused Mr. Cole's alleged injuries. *Schaub*, 638 F.3d at 921. There must be a showing of actual injury that is greater than *de minimus* to establish a conditions of confinement claim under 42 U.S.C. § 1983. *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008). Causation is generally a question of fact. *Schaub*, 638 F.3d at 921. In certain cases, expert testimony may be required to prove causation. *See, e.g.*, *Alberson v. Norris*, 458 F.3d 762, 765-66 (8th Cir. 2006) (finding the failure to produce expert testimony that a lack of proper medical treatment caused an inmate's death was fatal to a deliberate indifference claim, where the inamte's cause of death was pulmonary hemorrhage and renal failure resulting from Goodpasture Syndrome, a rare autoimmune disease difficult to diagnose because its symptoms present a "confusing clinical

picture" and "[n]o definitive therapy exists."); *Robinson v. Hager*, 292 F.3d 560 (8th Cir. 2002) (finding that expert testimony was required to show causal link between prison officials' failure to administer blood pressure medication and an inmate's stroke); *cf. Schaub*, 638 F.3d at 921-22 (determining expert testimony on causation was unnecessary because defendant's deliberate indifference clearly exacerbated the plaintiff's wounds); *Ricketts v. City of Columbia*, 36 F.3d 775, 779-80 (8th Cir. 1994) (concluding that, if in a particular case relevant evidence of causation makes the issue "free from doubt," the court may find causation as a matter of law).

This Court concludes Mr. Cole has not carried his burden of proving causation. Although many medical records were presented to the Court for consideration, those records do not support Mr. Cole's theory. No medical professional other than Nurse Hubbard testified. Mr. Cole did not present expert testimony on causation. Considering the many possible causes for Mr. Cole's current condition, the Court cannot conclude that any act of Officer Demery lead to an actual injury much less an actual injury that is greater than *de minimus*. There was uncontroverted evidence presented that Mr. Cole's clavicle moved at night during the healing period, that he did not wear a medical device recommended to him to aid in keeping the clavicle immobile during the healing period, that he suffers from other medical conditions that cause pain in his neck and back, and that his resulting condition may in fact be attributable to non-use during the healing period which may improve with therapy.

These causation problems also defeat Mr. Cole's official capacity claim against Officer Demery. Suits against officials in their official capacities require a showing that an official policy or custom caused a constitutional violation. *See Ricketts*, 36 F.3d at 779-80 (examining causation when an unconstitutional municipal custom has been alleged under 42 U.S.C. § 1983). For the factual reasons explained, Mr. Cole has not sustained his burden of proving that the ADC

policies on the use of restraints or Officer Demery's application of those policies caused a constitutional violation.

### b.    Alleged Need for Surgery

Mr. Cole asserts in his complaint that he was denied adequate medical treatment to repair his misaligned clavicle.  (Compl., ¶ 13)  He further asserts that defendants' alleged failure to provide him with adequate medical care caused him to suffer pain and permanent injury to his clavicle and shoulder area.  (Compl., ¶ 14) There was some evidence of this introduced at trial, so the Court will address these allegations.   Given the extensive record of medical treatment provided to Mr. Cole by the ADC, including examinations by Nurse Hubbard, a JRMC doctor, Dr. Scott, and specialist Dr. Lytle, this Court concludes that Mr. Cole's evidence does not support a claim that any prison official deliberately disregarded his suffering.  *See Alberson*, 458 F.3d at 765.  Even if this Court analyzes Mr. Cole's claim as one that the medical treatment provided to Mr. Cole was so inadequate as to rise to the level of deliberate indifference, the Court concludes that Mr. Cole's claim fails for several reasons.

As an initial matter, Mr. Cole did not sue the medical providers directly.  "[A] general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability."  *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995).  Prison officials who lack medical expertise cannot be held liable for the diagnostic decisions of medical staff.  *Id*.  Officer Demery was not involved in or consulted about Mr. Cole's medical care and treatment.

Further "[p]risoners do not have a constitutional right to any particular type of treatment. Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment."  *Long v. Nix*, 86

F.3d 761, 765 (8th Cir. 1996) (citations omitted). Moreover, "'a prisoner's mere difference of opinion over matters of expert medical judgment or a course of medical treatment fail[s] to rise to the level of a constitutional violation.'" *Meuir v. Greene County Jail Employees*, 487 F.3d 1115, 1118-19 (8th Cir. 2007) (alteration in original) (quoting *Taylor v. Bowers*, 966 F.2d 417, 421 (8th Cir. 1992)). The Eighth Circuit has also noted that a prison health care system's failure to provide treatment that is "as extensive as . . . a private health-care provider" might have offered does not rise to the level of deliberate indifference. *Logan v. Clarke*, 119 F.3d 647, 650 (8th Cir. 1997).

Even if Mr. Cole could prove a constitutional violation, he would still have to prove causation. On the point of causation, this Court finds the reasoning in *Robinson v. Hager*, 292 F.3d 560 (8th Cir. 2002), instructive. In *Robinson*, a prisoner suffered a stroke after prison officials failed to provide him with blood pressure medication. In that case, the Eighth Circuit Court of Appeals held that "although a person suffering from a stroke may exhibit visible symptoms, the stroke itself is a sophisticated injury which could be caused by numerous factors other than lack of medication. Therefore, expert medical testimony is needed to prove causation." *Id.* at 564. "A causal connection between an event and an injury or sudden onset of an injury occurs. However when the injury is a sophisticated one, *i.e.*, requiring surgical intervention or other highly scientific technique for diagnosis, proof of causation is not within the realm of lay understanding and must be established through expert testimony." *Id.*

Mr. Cole claims that he was told a surgery was necessary to repair his broken clavicle. As an initial matter, there is no evidence in any written medical record that any doctor, whether under contract with the ADC or not, suggested surgery to repair Mr. Cole's clavicle or to treat the residual medical issues he claims related to his shoulder injury. Mr. Cole did not offer any

evidence that this alleged lapse in treatment, and not some other factor, caused his current condition. *See Robinson*, 292 F.3d at 564 (citing *Crowley v. Hedgepeth*, 109 F.3d 500, 502 (8th Cir. 1997) (explaining that plaintiff must place verifying medical evidence into record to establish effect lapse in treatment had on medical condition)). There is evidence in this record that Mr. Cole was noncompliant with medical advice during his recovery, suffers from other conditions that might contribute to the situation about which he complains, and that his condition now is the result of non-use that may improve with therapy. For these reasons, the Court rejects Mr. Cole's claim based on this evidence.

### 2.    Claim Relating to Alleged Excessive Force

As this Court indicated in ruling on defendants' motion for summary judgment, this case could be evaluated as an excessive force claim, given that Officer Demery used force that Mr. Cole contends was excessive to restrain him. "The objective standard that must be satisfied in a conditions-of-confinement claim differs from that applicable in the excessive force context, where the malicious and sadistic use of force by prison officials always violates 'contemporary standards of decency.'" *Schoelch v. Mitchell*, 625 F.3d 1041, 1047 (8th Cir. 2010) (quoting *Wilkins v. Gaddy*, __U.S.__, 130 S. Ct. 1175, 1178 (2010)). This Court finds that Mr. Cole has not carried his burden to establish that Officer Demery handcuffed him in a manner that was sadistic in violation of Mr. Cole's Eighth Amendment protection against cruel and unusual punishment. Further, Mr. Cole has not proved causation even if this Court evaluates his claim as an excessive force claim.

### 3.    Qualified Immunity

Even though this Court finds no constitutional violation on these facts, the Court will proceed to evaluate Officer Demery's claim of qualified immunity. At the summary judgment

stage, this Court determined there was a genuine dispute about predicate facts material to the qualified immunity analysis which precluded granting summary judgment.

Qualified immunity protects an individual-capacity defendant in the performance of discretionary functions unless the official's actions violate an inmate's "'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007) (quoting *Shockency v. Ramsey County*, 493 F.3d 941, 947 (8th Cir. 2007)).   Officer Demery's actions which Mr. Cole challenges were clearly discretionary, as opposed to ministerial.  *See Sellers By and Through Sellers v. Baer*, 28 F.3d 895, 902 (8th Cir. 1994) (citing *Davis v. Scherer*, 468 U.S. 183, 196 n.14 (1984)).

A constitutional right is clearly established when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.  In other words, "the unlawfulness must be apparent" to the official.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The application of qualified immunity generally turns on the "objective legal reasonableness" of the action, assessed in the light of the legal rules that were clearly established at the time it was taken.  *Id.* at 639.  "Stated another way, qualified immunity shields a defendant from suit if he or she could have reasonably believed his or her conduct to be lawful 'in light of clearly established law and the information [that the defendant] possessed.  The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (citations omitted) (alteration in original) (quoting *Hunter v. Bryant*, 502 U.S. 222, 229 (1991)).

On these facts, the Court concludes Officer Demery also is entitled to qualified immunity for his acts.  The Court credits Major Gibson's and Officer Demery's testimony regarding

whether any directive was given by Major Gibson on the use of restraints; no direct order prohibiting the use of restraints was given.  Officer Demery testified that, although he had some discretion under the ADC policy in the application of restraints under the circumstances, he handcuffed Mr. Cole while transporting him to and from the Varner Unit and JRMC due to public, inmate, and officer safety concerns.  Based on this evidence, Officer Demery could have believed his conduct was lawful and in accord with ADC policy.  This belief was not plainly incompetent or a knowing violation of the law, therefore entitling him to qualified immunity.

### 4.     Punitive Damages

Punitive damages may be awarded under 42 U.S.C. § 1983 "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"  *Schaub*, 638 F.3d at 923 (quoting *Smith v. Wade*, 462 U.S. 30, 56 (1983)).  It is a question of fact whether a defendant's conduct was motivated by an evil motive or involves reckless indifference to the federally protected rights of others.  *Coleman v. Rahija*, 114 F.3d 778, 787 (8th Cir. 1997).  The Court finds no basis to conclude a constitutional violation occurred here and, therefore, rejects Mr. Cole's claim for punitive damages.

* * *

The Court finds and concludes that Officer Demery did not violate the requirements of the Eighth and Fourteenth Amendments when handcuffing Mr. Cole on the return trip from JRMC to the Varner Unit on September 9, 2008.  In the alternative, the Court concludes Officer Demery is entitled to qualified immunity based on the evidence and testimony presented at trial.  Based on these findings and conclusions, a judgment for defendant Officer Demery will be entered separately.

SO ORDERED this 24th day of July, 2012.

_____
Kristine G. Baker
United States District Judge